Madam Clerk, if you'll call the next case, please. If the attorneys will please approach the bench. Good morning, Justices. Assistant State's Attorney Ahmed Bassett on behalf of the people of Illinois. Spell your last name, Mr. Bassett. B-A-S-S-E-T. Hi, I'm Adrienne River on behalf of F. Lee Donald Harrell. Okay, and what type of time do you want? I'd like to take the full 15 minutes for the initial speech and then about two minutes for rebuttal. Okay, counsel. Depending on the questions, I think I can do it in 10 minutes. Okay, great. Keep your voices up. Like I said, counsel, if you need more than 15 minutes, that's fine. We clearly do not watch our clocks in this division. Take whatever time you need to get to your point. We just simply ask you not to repeat yourself. Okay. Justices, counsel, may it please the court. This case is about whether the Illinois legislature intended to limit police officers from exercising their police powers within non-bordering municipalities connected within the county in which they are to serve and protect. When you say non-bordering, is that the same as non-adjoining? Non-bordering, as in these are counties that don't directly touch. But for the purposes of the municipal code, section 748, the point of it is that these are adjoining municipalities within a county. And our interpretation in the plain meaning and ordinary meaning of that language is that these are counties that must merely be joined or connected together circumscribed within the borders of a county. This is a superior interpretation because it advances the legislative intent of fostering greater cooperation in the purpose of establishing more cohesion in law enforcement. Now, this position is supported by the existing case law. And the pinnacle case in this regard is People v. Kiribatis, which was decided by the second district in 2000. Now, this case is instructive because at least twice on page 527 it indicates that police officers can act beyond their jurisdiction to arrest a defendant as long as it is in any municipality within a county. This does not say that these municipalities must be bordering. And in fact, in this case, you had a police officer from Dupage County. Are you saying that they can go into Lake County and arrest someone for a crime that was not committed in Cook County? No, that is not what I'm saying, Your Honor. Isn't that the fact here? Well, no. In this case, you're right. In Kiribatis, you had a Dupage County police officer arrest an individual in Cook County. Now, the court there was very specific in saying our decision would be different if there were some affirmative evidence to indicate that the defendant were arrested in Dupage County. So it has to be within the borders of the county. Counsel, why do you want us to look at the cases when we can just look at the statute or the municipal ordinance? And it appears to be pretty clear to me. This is the territory which is embraced within the corporate limits of adjoining municipalities within any county in this state. Why are we going to all these cases? Why aren't you focusing on the language in the report? Well, the best indication of the legislative intent is the plain and ordinary meaning of the language. Now, the plain and ordinary meaning of what it means to be adjoining municipalities within a county has been understood by courts not only in Kiribatis, but also in Lynch v. Young, the Northern District 2008 case in which that's actually a scenario in Lynch that mirrors what occurred in this case, insofar as the counties that were involved were not bordering, but within the same county. And for the purposes of 1983 civil liability, the court there clearly stated that in Illinois, police officers can go into another jurisdiction as long as the municipalities are within the same borders. It's an explicit understanding of what this language means. And it's with respect to the legislative intent, because ultimately, in a matter of statutory interpretation, our objective is to give the full effect of the legislative intent. And this case in this court in Vargas was very explicit about what the legislative intent was behind Section 748. It couldn't be any more clear when they stated that the public policy is to promote cooperation in order to facilitate greater cohesion in law enforcement. How did they cooperate? In our case, how did they cooperate? Well, they cooperated insofar as the Chicago police officers who received a reliable tip then went to their central command, got approval, and then went to Maywood and said, look, we have a plan of investigating this particular reliable tip that we have. At that point, the Maywood police department essentially signed off and said, go ahead. Did they essentially sign off? I don't understand. Did Maywood request the Chicago police department to conduct this surveillance for a crime committed in Maywood? Well, for the purposes of the criminal code of procedure, we argue that it was functionally a request. But with respect to the municipal code, I'm sorry, where in the evidence does it show that Maywood requested? Well, our position is that there's no functional difference between whether or not a law enforcement agency asks for help or agrees to be helped. Because in either scenario, you have the purpose of the legislative intent advanced. Did the legislature intend that Chicago police department could go down to Cairo, Illinois, which is I think the furthest point, and conduct surveillance down there? Is that what they intended? Well, they did under the criminal code of procedure, which clearly states that a police officer can go in any jurisdiction in Illinois provided any one of those four enumerated provisions are met. And under the third provision, which is that they are requested by that municipal division, that's permitted. So they notify Cairo, we're down here conducting surveillance and we intend to arrest someone. Cairo, just by being silent, wouldn't Cairo presume it must be something that happened in Chicago, the fact they're down here?  In fact, Cairo, in this case, if they objected, then certainly Chicago police couldn't go down to Cairo and undertake a surveillance within their jurisdiction. And in fact, in this case, by the fact that they did not object is essentially a green light for Chicago police to go ahead and continue on with their surveillance. Moreover, this was a mutually beneficial arrangement for both Maywood as well as for Chicago and the citizens of Cook County. And the reason being is that Maywood was able to take care of a crime that was occurring within their municipal borders without having to expend a single dime or use a single hour of manpower in this case. And in a situation where municipal budgets are really depleted, it's important that they be able to leverage the resources of other members of Cook County. Moreover, the defendant's position would actually undermine the cohesion within Cook County for the simple reason that the municipalities that are at the border's edge that don't touch Chicago, those are municipalities that can't leverage the resources of Chicago police officers, even if they wanted to under the municipal code. So you would say that because Maywood needs more policemen, that Chicago is welcome to go down there and act as their police force? Well, no, not necessarily, Your Honor. And in this case, at which point Maywood said, sure, go ahead, come and sort. Sure, go ahead? No, they were told. They weren't requested. And as far as I can see, the evidence, they didn't really consent. But they had the ability to object. And at which point they didn't object. And they know it was a crime committed in Maywood and not in Chicago? Oh, certainly. They did know that the surveillance would occur in Maywood and that the defendant was somebody that was in Maywood. The crime was occurring in Maywood. And so at that point, it would be an overstretch to say that they didn't want this to happen. Certainly, they did, at which point they acquiesced. And functionally, if this court were to take the position of the defendant in this case, it would functionally invalidate what was otherwise a valid approval of Chicago police officers to surveil in Maywood. And this is a direct undermining of the legislative intent. It couldn't have been more clear. And in fact, Vargas is very sure to point out that it would be imprudent for a police force, such as Chicago police officers in this case, to just stop their efforts, especially where there is an apparent agreement between the municipal divisions. Now, we could argue as far as, did they collaborate? Were there officers from Maywood involved? But the point of it is that the legislature only required cooperation. And if we can appreciate the fact that cooperation can range from tacit cooperation to active cooperation to the point where it could be characterized as collaboration, then we understand that the breadth of cooperation, the spectrum is quite wide. And the legislature did not mandate collaboration. They just required some level of cooperation. And that, at least minimal standard, is met in this case. And in fact, that's a position that's supported by public policy, as well as the fact that, in effect, under the defendant's position, it would have been better for Chicago police officers to not have been proactive in this case. They should have functionally just told Maywood that, look, you've got a crime occurring within your borders, and then sat back and waited for Maywood to say, hey, could you help us? In fact, what you had in this case, rather, was Chicago police officers say, you have a crime occurring within your boundaries, and we have a plan to investigate that. At that point, Maywood acquiesced. And that is the type of cooperation. That is the type of fluid cooperation and cohesion that was the intent of the legislature. Otherwise, it would undermine the idea of being proactive and coming up with a plan, and then just sitting back and waiting until you're formally requested. Our position is that there's no functional difference if our intent and our objective is truly to advance the legislative intent. Now, moreover, going back to the municipal code, what's important to look at also is the judicial or the legislative trend in how these statutes have been interpreted, especially in the area of jurisdictional law. Initially, the only type of extra-jurisdictional types of efforts that Chicago or any type of police officers could make were with regard to fresh pursuit, and if there was a civilian, there was a private arrest. But the legislature understood that crimes are increasingly multi-jurisdictional. They don't just stop at border's edge. And in fact, it requires police officers and agencies to work in a more cooperative manner. And in that regard, they amended both the municipal code and the criminal code in the very same bill in 1999 to expand the scope of police authority to not just quell a riot or in emergency situations, but to use the full scope of their police powers. Moreover, in the criminal code of procedure, they also amended section 107.4, which is the very subject of our case today, to allow for officers to not just operate in their jurisdiction, but anywhere in the state. And so we understand that the legislature has tried to expand the scope of authority, as well as the territorial scope within which officers can respond to a legitimate crime that may be occurring within, in this case, Cook County. Now, with respect to section 107.4 in the criminal code and whether or not there was a request, again, there's no functional difference between whether the Maywood Police Department, you know, asked for this request or they agreed to be helped. If it was the case where Chicago police officers never notified Maywood police and went into Maywood, as was the case in Carrera, or if they informed the police officers or Maywood police and they objected, then there would be much more of a position that defendant could take here. But that simply wasn't the case. Now, even if this court were to determine that the Chicago police officers lacked the statutory authority to operate in Maywood, the exclusionary rule should not be applied to suppress the defendant's statements. And it's simple, because the violation of a jurisdictional statute, a state jurisdictional statute, does not equate to a Fourth Amendment violation under which the exclusionary rule is traditionally applied. In fact, in Hudson v. Michigan, the Supreme Court was pretty explicit in that the exclusionary rule is a rule of last resort rather than first impulse, and to be applied only when the deterrent effect of future police misconduct outweighs any substantial societal cost. The trial court made a finding, and one of the findings was that there was no request of Maywood police that they wanted assistance. That was a factual question, a factual decision, wasn't it? Well, if I could – You heard all the evidence. I'm sorry? Nothing was hidden from the trial judge. He heard all the evidence. But I would disagree with your premise that the trial court ruled that Maywood police department was not asked. The trial court stated that Maywood police did not go along and, you know, collaborate, if you will, and engage directly, but it didn't say that Maywood police department was never asked. No, he said no request to Maywood police that they wanted assistance. That's what the trial judge said. Well, then that goes back to the issue of did they request it or not, and in that sense, the trial court's interpretation was a matter of law. They just looked at the fact and said they didn't request it, and that wasn't sufficient. But that – So the trial judge didn't basically – okay. But the trial court judge did not say that Maywood was never asked. Certainly that – and it's not borne out by the record. Sergeant Spencer, which provides the only unimpeached testimony in this case, is pretty explicit about that occurring. Now – He testifies, I recall, that he called them and told them – Yes. Conducting surveillance. Yes. Is there evidence that he told them there was no connection to Chicago? There's nothing in the record to suggest one way or the other. Wouldn't that presume – I don't know. It doesn't presume anything. Just think that if I were Maywood, I would presume that Chicago's out here is related to Chicago. Well, certainly if that were a concern of Maywood, they were at full ability to ask that. And the fact that they allowed Chicago police officers to go in, you know, indicates that they had a certain level of trust in what they were about to – They were allowed to go in. They did not request them to come in. Pardon me? They did not request them to come in. Well, they didn't ask. They were staying. They were on their way out there. They didn't particularly – but this brings up a really fundamental point insofar as it was the Chicago police officers that were privy to the tip in this case. It wasn't Maywood that knew of the criminal activity afoot within their municipal borders. Then in that scenario, it would make more sense that they would call up Chicago and say, we need some help. But in a scenario as presented here, where they were not privy to this information, it was Chicago police officers that were privy. Then at that point, whether they asked for the help or whether they agreed to be helped – Why would – it's a practical question. Why would Chicago Police Department – Why would they pursue it when crime wasn't connected to Chicago? Well, I would respectfully – I have limited experience in law enforcement. But it seems like if you don't need to go out there, turn it over to Maywood. And you make up a – you bring up a – Do we want a star? Do we want to get some golden points, as it were? Well, certainly. Police officers don't want to create more work for themselves than they have to. And nobody really does, frankly. In this case here, it looks like they did. But they certainly had an interest in this case. And the reason being is this understanding that crimes, especially drug trafficking, is multi-jurisdictional. When you have Maywood that sits about a five-minute drive off of the Eisenhower Freeway into one of the largest drug distribution hubs in America, then it is in the interest – Is there evidence of that? I didn't know that. No, I'm not – There's no evidence that I can give you right now that Chicago is one of the largest – It's only in a neighborhood, a high-crime neighborhood, without any evidence. But Chicago is the third-largest city in America. And we know that drugs are being trafficked. And this is a hub. This is a Midwestern hub. And at that point – Chicago, not Maywood. Chicago is. But nevertheless, it has to get through these municipalities to get to Chicago, ultimately. And it's not as if Maywood is on the other side of the state here. It's within a five-minute drive, depending on the traffic, of course. This is the point of curiosity. Because I hear these things called the Federal Task Force. And it has police departments, I guess, in the metropolitan area. And they all cooperate. And there's some from Chicago, maybe someone from Maywood in their task force. Why didn't they go to the task force? I mean, that's a good question. But it – I said it was just curiosity. Sure. But the legislative intent was to facilitate greater cooperation without formal agreements that were in place already. Police officers have to be able to react in an ad hoc manner as crimes and tips are coming in. And at which point the tip was reliable, it was incumbent on Chicago police officers to say something. Especially because – and going back to the point that you made earlier, Justice Murphy, as far as how does this impact Chicago? Well, it impacts it directly because we had the confiscation of nearly 7,000 grams of cannabis, three grams of heroin, and worth about $30,000 and $30,500 worth of street value. This was more than likely – this is an inference that we're making, but more than likely not designated merely within the borders of Maywood. In fact, it was very – it's a fair inference to say that this was earmarked for territories outside of Maywood within Cook County, especially Chicago. That's a reasonable inference, especially when considering that next to these drugs was found a scale, baggies, and an unregistered loaded pistol that the defendant himself admitted I got off the streets. And so it's a fair inference to say that these drugs weren't just earmarked for Maywood. And so certainly Chicago police officers had a direct interest in preventing crime. This is what the legislature intended, is to take a preventive approach to combating crime, especially when there is an apparent agreement between the two municipal districts involved here. Now, returning to the exclusionary point and whether it should apply, a violation of a jurisdictional state statute does not warrant application of the exclusionary rule because it does not implicate at all the Fourth Amendment. Now, the critical hallmark case is Golan, which was decided by our Supreme Court in 2008. And in Golan, Chicago police officers failed to comply with the magistrate provision of the Indiana's fresh pursuit doctrine or statute. And the Illinois Supreme Court refrained from actually applying the exclusionary rule, determining first that Chicago police officers did not violate the defendant's constitutional rights, but moreover, excluding this evidence would have a nominal deterrent effect on future police misconduct where officers were unaware that they were even in Indiana. Now, the similar reasoning should apply in this. In that case, where did the crime originate? It did originate in Chicago. OK. In our case, it did not originate in Chicago. It didn't. You're right. But the issue involved is that was a violation of the magistrate provision of a state law warranting the application of the exclusionary rule. And the analysis that Golan made was that, no, for two reasons. First is that that statute in Indiana did not intend or state that the exclusionary rule should be applied if violated, which is an indication of legislative intent. But moreover, the violation of the magistrate provision did in no way undermine or violate the defendant's constitutional rights. And in fact, these were rights that belonged to the municipality involved or the state involved. And invoking vicariously the rights of the municipality is not a basis for applying the exclusionary rule. And that's precisely what we have in this case. A violation of a jurisdictional statute in no way implicates the rights of the defendant. It implicates the rights of maybe Maywood. But defendant is trying to invoke a right that does not even belong to him. And there's no, aside from some nebulous argument of privacy or due process rights impinged that the defendant can make, there's really no argument in that regard, especially because the defendant has no constitutional right to be investigated and arrested by a particular police department. His position is, frankly, I was investigated and arrested by the wrong police department. But there's no constitutional right to being investigated by the right police department in his mind. Now, that being said, for those reasons, you see that a violation of the statute that does not implicate the defendant's constitutional rights does not warrant exclusion. I don't think we're arguing that. I think we're arguing, did they follow the statute? Did they exceed their authorization by going to a municipality which was not adjacent to it? Did they act without authority? And if this court were to say that they did, even if they did, the exclusionary rule should not apply to such a violation. But what Carrera says, doesn't Carrera take a different position? Carrera merely says that it's applicable in such a scenario. It doesn't state that it's mandated. But it's applicable. And we don't disagree. Gallant didn't overrule Carrera, right? But Gallant actually made a critical distinction as far as Carrera goes. And because in Carrera, the officers did not have statutory authority because the statute involved, the municipal code 748, was actually in violation of the single subject rule. And as such, was void ad initio. And for those reasons, the court said, we don't want to undermine our doctrine as far as the single subject rule or the void rule. And because they didn't want to create, functionally, a grace period which would undermine the jurisprudence in those areas of law. Those issues are simply not implicated in this case. Moreover, in Carrera, you have a critical factual distinction insofar as the officers didn't even inform the jurisdiction that they were going into. But here, they did. And really, the hallmark of this analysis is whether or not there was police misconduct to begin with. And the police in this case did not willfully transgress the sovereignty of Maywood Police Department's authority. They didn't intentionally try to violate a statute of jurisdiction. They did in their best attempt to solve crime, to prevent crime in this case. And they did so with a good intent. And it was essentially involuntary, as it was the case in Golan. But even if this court wanted to apply the exclusionary rule, it shouldn't. Because the good faith exception would certainly apply. Now, at which point the controlling law on this matter of what constitutes a police district is established by Keir Bilatus, by Lynch v. Young, by Haroon. These are all cases that are very explicit in saying that the municipalities merely need to be within the borders of the county, not that they have to be bordering. So it's in good faith reliance of the existing case law that the police officers operated in Maywood in this case. And so they shouldn't be held that the suppression of the evidence in this case would serve no sort of deterrent effect, especially when considering the substantial societal costs that are weighing in this case. You have highly probative and highly reliable evidence that's been suppressed. And there is a substantial impairment as far as the prosecution goes. Moreover, it impedes the very legitimate fact-finding attempts of the police officers in this case and the court in general. And so when weighing even the deterrent effect, which would be nominal because the police officers did not act in willful disobedience of any type of law or the territorial sovereignty of the Maywood Police Department, there would be no purpose to applying the exclusionary rule. And so if there are no more questions, I'd like to reserve the remainder of my time for rebuttal. You're basically saying that the legislature intended that Chicago Police or any police department could go 100 miles away and have jurisdiction so long as they just notified that jurisdiction, that municipality? Functionally, under the third A-33 of the criminal code of procedure, as long as they notified- The legislature and municipal code, did they intend that? No, I mean, because it's explicit that the municipalities must be adjoined within the county. And so if that county is not 100 miles long, they certainly couldn't do it. But under the criminal code of procedure, they could go 100 miles away if they notified and the police department in that jurisdiction acquiesced. So, oh, they acquiesced. And there's no evidence here, according to the trial judge, that there was a request by the Maywood Police Department for the Chicago Police Department to go out and conduct surveillance for a crime that was committed in Maywood. Well, the factual finding that the trial court judge made was not that the request wasn't made. It was that the officers in Maywood did not ride along with the police officers and help. And moreover, the distinction, again, is that the police officers in Chicago were the ones that were privy to the tip. And so under defendant's interpretation, in such a scenario where it's the police officers in the subject jurisdiction that don't have the tip, it would functionally preclude any type of request in that situation. It would require, in other words, for the Chicago police officers to just sit back and formally wait for a request before saying, hey, we've got a great plan for how to handle this, which is truly undermining cooperative sorts of attempts to thwart crime. Thank you. Good morning, Your Honors. The state has argued that the... Could you state your name again? Oh, Adrian River, Assistant Appellate Defender for Appalachia, Donald Harrell. That its interpretation in advance of the statute is based on a legislative intent to foster cooperation. The case that relies on Vargas, in that case, there were two separate police departments involved in a joint meeting concerning an undercover operation that the one municipality wanted to pursue. The statute is very clear. Adjoining means touching, situated next to. There's no ambiguity here. If the intent of the legislature was to allow officers to go anywhere in a county, then it would have just said that. Adjoining would be superfluous. There's no role of construction that allows a court to read out the plain meaning of the statute. And curvilitis, which the state relies on, is plain wrong. It doesn't cite any authority for the proposition that adjoining doesn't mean it's plain meaning. It cites Marino, a case that we rely on, that noted correctly that the statute says that the municipalities have to be adjoining. And it is dicta and has no precedential value, although it has been cited incorrectly, because in that case there were two different counties involved. So your position is essentially all we need to do is read this ordinance and we can reach a result. We don't need to consider the policy that your opponent presented us with. Those kind of policy arguments should be made to the legislature. The policy that's reflected in the definition of a police district is that it is limited to the adjoining municipality, not an unincorporated area, not another county, not a few miles away, as in this case. The trial court took judicial notice of that. I also wanted to make a response to an argument they made for the first time in their pride brief, that because the legislature didn't act afterwards to amend the statute, that that is acquiescence by the legislature. What the state didn't cite was the Illinois Supreme Court law that says that kind of presumption is really just an aid to construction. It does not apply when the statute is unambiguous. In fact, the court has said in a case, Perry from 2007, that lack of amendment to the statute is, quote, meaningless where the language is unambiguous. The Chicago police have an interest in fighting crime in Chicago. That's what they're paid to do. If they have a tip, they can pass it on to Maywood. There was a phone call here, a lot, we have very little evidence of what happened in that phone call. We don't even know who they spoke to. We don't know the person didn't object. We don't know the person was just an operator taking a message for somebody. And the fatal flaw to their argument that this somehow could be acquiescence is that the officer testified, I called Maywood and I said we'd be doing, we'd be conducting surveillance. Those were his exact words. Not we might try to do a Terry stop. Now we might go to a Maywood residence and ask someone if we could search their house and that if it pans out that we think this is the guy, we're going to arrest him. So it's clear that the provision allowing arrests in a different jurisdiction when a request is made was not satisfied here. And the judge did indicate there was no request here. Chicago was doing something independently. It did not, it was not working with Maywood. And finally, on exclusionary rule, we have two Supreme Court cases that say that is the appropriate remedy. The crucial case is not Golan, which didn't involve an extraterritorial arrest that was unauthorized because the police were outside of their district. The state argues for the first time, I believe, in its oral argument that even if exclusionary rule should apply, there should be some kind of good faith exception. That wasn't raised below and my reading of the brief, that was not something they argued. In any event, I don't see how good faith could apply here. This is not a case like Golan where the officers inadvertently crossed over to a different jurisdiction by 0.8 miles. They knew they were going to Maywood and they knew Maywood was not in their jurisdiction. They made the call. It's obvious they knew, it's presumed that the officers knew what the statute says. The statute couldn't be clearer and I have yet to hear except public policy arguments, any statutory interpretation argument by the state how we can read, how we can transform the word adjoining in the definition of district to mean non-adjoining. It's ridiculous on its face. There are no further questions. I'd ask this Court to affirm the ruling below. All right. Thank you. I'd like to address three specific points that the opposing counsels made in this case. The first being that the people have yet to advance a not absurd understanding of what it means to be adjoining. But the reality is that the people are the only ones that have provided any case law interpreting what it means to be adjoining municipalities with a county. In fact, the only case that the defendant cites in this case is Boyd. And that's not an instructive case because it merely reiterates the language of the statute with respect to two municipalities that are bordering in a county. It's not dispositive. But the dispositive cases in this trial are Kyrgolatis as well as Lynch v. Young. And they're very specific that the municipalities need only be within the county. That is- Counsel, is it your position that the ordinance in this case is ambiguous? No, it's not. The plain reading of the language of what it means to be adjoining if we are to give full effect to the legislative intent is that the municipalities need to be within the county. And there's no disagreement, interestingly, from the defendant that the interpretation of the peoples is superior insofar as extending or advancing the legislative intent. Her only argument is that you need to take this up with the legislature. Well, the legislature has been quite clear in this regard insofar as saying we want cohesive, more cooperative law enforcement. There's not a single argument that the defendant can make about why her interpretation of what it means to be adjoining municipalities is going to advance the legislative intent. This court has been very clear about what the legislative intent is. There's no disagreement in that regard. And that's why we should read adjoining as municipalities connected or joined together within a county. Now, the second point I'd like to make is that the municipal's code does not actually require any type of request. Chicago police officers did not have to call Maywood Police Department. There's no requirement of that sort. And yet it did so anyways out of respect for the territorial sovereignty of Maywood and the agencies that operate within. And that's a If this is voluntary and it's decided I'll call Maywood, there's no other statute that requests, that a request must be made? There's no statute that requires that request. Even the criminal code of procedures, section 107-4 under the 8-3 provisions don't per se, or under 8-3-3, there is the request provision.  You relied also on 107-4, and that says if the officer, while on duty as a police officer, is requested by an appropriate state or local, and you're saying he was requested. So a request is required. Well, it doesn't require that municipal police department to ask. It's the other way around, right? Where the subject municipalities police district would request. But our position is that we fulfilled it regardless. We asked regardless. But under the municipal code, there's no requirement to request when operating within the borders of your county. And so Within the borders of your county or your district? Well, within the police district, right? And for our purposes to understand what a police district is, it encompasses the municipalities joined together within the county. Finally, as far as the exclusionary rule goes, there's no, the defendant cannot make, there are two facts that are really working against them. The first is that there's no response to the fact that the statute that was theoretically violated in this case did not implicate any constitutional rights of the defendants. And there's no response to that. And at that point, there's no need to apply an exclusionary rule remedy. But the second biggest fact that's working against them is that there was no police misconduct insofar as crossing a jurisdictional line in a willfully misconduct way. They actually got the approval of the Maywood Police Department before going in there. And moreover, they knew what the case law was. They're presumed to know the law at the time. And that law is established by curvilatus lynch versus young and its progeny of cases that indicate that the municipalities merely need to be within the county. And so any police officer, especially the Central Command Operational Center of Chicago Police Department, would understand it to mean within the county. At that point, requesting the permission to engage in that county was not required by the municipal code. But nevertheless, the officers went ahead and did that. And so they acted in full bounds of their police power. And it was not willfully misconduct. And at that point, there's no deterrent value to suppressing the evidence in this case. And if there are no further questions, we'd ask this court to reverse the trial court's rulings and remand this case for further proceedings. Thank you. Thank you. We'll take this matter under advisement. And this court is now adjourned.